also known as Yankee, also known as Yigo Appellant. Mr. Gilbert for the Appellant, Ms. Goodman for the Appellee. Good morning. Good morning, and may it please the Court. My name is Richard Gilbert. I represented Mr. Cano-Flores both at trial and on this appeal, obviously. I have asked to reserve about four minutes for rebuttal, and while I've been around the  long enough to know this argument's going to go where you want it to go with your questions, basically I'd like to spend about half the time on the wiretap issues and about half the time on the sentencing and forfeit issues, if it pleases the Court to go that way. The first issue I'd like to take up is the minimization issue concerning the wiretap, and I think that basically this issue boils down to which party has to answer the why question, and the why question in this case is why did they keep listening? If I may explain, unlike the Scott and the Supreme Court case and the Carter case in this Court, we used a specific methodology at the trial level in which we identified non-pertinent calls that lasted two minutes or more. The consequence of that is a number of the factors that the Scott where their issue was really why not minimize are not applicable because it's not short phone calls, it's not calling the weather, it's not wrong numbers, it's not the person wouldn't come to the phone. What it means is that the listening agent had an opportunity to listen to a live conversation for two minutes, give or take, and more in many cases. During those two minutes, the agent, him or her, did not come to the conclusion there was anything plainly pertinent. Now, we understand that that does not mean as a matter of law they had to stop and minimize at that point, but the question is why did they feel they needed to keep listening? And so it is our view that at the point when we've identified the two minutes or more that are non-pertinent, that the burden then shifted to the government to explain reasons coming from context or content as to why that led them to believe that they needed to keep listening to a call that was not readily apparent to be pertinent. And you had, as I understand it, the names of the parties involved in each call, right? Well, no, in some cases we never did know who the persons were. In some cases we knew, in some cases we even stipulated. I thought those lists in the Joint Appendix had Calder, Caldee. Many of them did, Your Honor, but some of them did not because, quite frankly, with the exception of a couple of calls between the fellow we call Manolo, since he used so many calls, actually were not on the calls. And so as a consequence, if they knew who the person was, fine. As I said, in several cases we stipulated. I was wondering, to the extent that you did have the names, I was puzzled that you didn't try to make anything of those names. Not that someone seemingly totally uninvolved might be experiencing, but at least, Your Honor, it would be a start to show, suggest reasons why a particular payer involved in the call would be unlikely to be participating in the experience. Well, certainly, certainly all the calls we did trial were calls that were deemed pertinent. And in many cases, when Connell Flores was talking to Metro Trace, who was arguably his superior, we stipulated that's who those people were. But a lot of the other phone calls, they're just more pertinent. We didn't know who they were. I mean, they're concluded to be not pertinent, but the question is, the question in my mind is, is there anything besides being concluded to be not pertinent, lasting two minutes or more, that makes your case, helps your case of inadequate immunization, could it not have been made? Well, particularly, I mean, as the Supreme Court has noticed, there's a real problem here because people use codes, and there are lots of people involved. And I know from my own friends that sometimes 8-year-olds, for example, can be used to do things that, for good reasons, the older people involved don't do. It's, you know, something about these people that would tell us that you really can't cross them off the list. Well, I think it's useful to look a little bit at the actual Supreme Court case of Scott. Because in that case, we've said we believe it only went to a burden of production. In that case, the government did. Now, mind you, that had been a ruling in favor of the defendant below. In that case, the government actually did file something called a call analysis, in which they told the court, including this court and the district court, why they didn't minimize those calls. In other words, now, it was done after the fact, and the defendant didn't like that. If you were manned in this case, that will certainly happen again. It will be after the fact. But they did come up with a reason. Can I ask you then about our decision in Carter? So, in our Carter decision, we said a defendant must identify particular conversations so that the government can explain their non-minimization. So, that seems to put the burden on the defendant, to identify particular conversations. And that decision also stands for the proposition, as you know, that wrote statistical evidence is not going to suffice, that it has to be something more than that. So, one way to read that decision is that the burden is on the defendant to identify the content of particular conversations. Well, and that's where, you know, it didn't say that. It said we had to identify the calls, and in our view, that's what we did. We identified the calls. You know, it's important in Scott, I think... Only by reference to two factors, duration and ultimately classified... That's how we came up with the list of the calls we identified, yes. That's what we And how is that different from what happened in Carter itself? Because in Carter itself, the point was made that a certain percentage of non-pertinent calls were minimized. The way I would distinguish that is, first of all, Carter just made a general claim. He said, well, you know, you didn't minimize a certain percentage. Non-pertinent calls. Non-pertinent calls. Obviously, they don't have to minimize a pertinent call. And realistically, they don't have to minimize a call, you know, that might be pertinent. They get to keep listening to it. But why they keep listening to it is going to be a function of what's in the agent's mind. One of the points that they made in Scott was that, look... I'm sorry, I didn't mean to cut you off, but what more did you do, just so we percentage of non-pertinent calls that were minimized? And then in Carter, this court said, well, that's not enough. The defendant has to do more than that. The defendant has to identify particular conversations. And I take your point that you don't think that means content, but that's at least one interpretation of it. Oh, yeah, that's the issue. What more did you do materially than identify a percentage of non-pertinent calls that were not minimized? Well, I mean, we identified the calls. I mean, we have a list of the calls. We didn't just say, here's a percentage. You know, we said, these are the calls. But what does that do? The fact that you're listing a number of calls, I guess I'm not following exactly what that does, other than give you a tool with which to make a percentage. Because if all you're doing is identifying calls, suppose, in other words, the defendant identifies 17 calls, doesn't tell you anything about the calls, just identifies 17 calls by call number, then I take it that the immediate response is going to be, okay, well, that's the numerator. What's the denominator? And then you get a percentage. And at that point, it doesn't seem like anything more has happened than what already happened in Carter. So what does it do for, what does it do to advance your cause that particular calls were identified, other than to give some tool with which to make a statistical assessment, which Carter said was insufficient? No, I think what it does is it shifts the burden. The issue is not over simply because of a given percentage. You know, in some of these lines, they didn't minimize any of them. It's not over then, but the question is, who explains why they kept listening? And in Scott, one of the issues was the agent said, we didn't bother. And the Supreme Court said, look, their motive isn't important. What is important is what they, the facts that were known to them at the time. And that seems to me to be agreeing with the concept, because the government did provide that information in Scott. That seems to me to support the concept that, look, when it comes to what's in the agent's mind, why do I need to keep going? It might be code words, Your Honor. It may be, hey, this is a suspicious number. We need to find out what's going on here. I do understand there will be calls like that. And it may even be that there's a majority. But I think to try to have the defendants say, without access to the confidential investigation documents, to have the defendants say, oh, well, this is, this couldn't possibly be pertinent. I mean, sure, Judge Rothstein talked about, you know, if we had romantic, you know, phone calls, that would be one thing, I suppose. Putting aside the cases where you say the data turned over to you and you did not include the name of the other party, why can't the defendant at least come forward with something about these people which would persuade a listener that they're not going to get anything? Well, let's stop a minute, though. What is it that we would provide? Because remember, it's not what the actual truth is. It is what is in the agent's mind when he or she is listening to the call. The fact that we might be able to prove after the fact that Senor Lopez, you know, was in fact somebody who provided animal food, the fact that we prove that after the fact doesn't help us if the agent's had a reasonable belief at the time that Senor Lopez may have been involved in the conspiracy. Well, at least if he's a provider of animal food, that might shift the burdens to that call, right? I would see, depending upon the conversation, a little bit different. I certainly see what you're saying. I guess I just respectfully disagree that the burden should be on the defendant to try to show what was in the agent's mind as to why we kept listening to a call that we couldn't find patently pertinent. I think these questions are just going to what more can the defendant provide that may have some relevance as distinct from what was in the agent's mind. That's all. You're saying you listed the calls and Judge Williams was asking you about only those calls where you knew the party's identification. Okay. And your position, I gather from your responses here this morning, is once you identify the call and the length of the call, that's all a defendant can do. That would be relevant to this question about why did the agents keep listening. Yes, Judge. That's what our argument is. Because to use the example, we don't know what the agents think code words might be. I used an example in my reply brief. They may think cattle means drugs. And if we could prove that cattle actually meant livestock in every call, so what? We still don't prevail because it's from the point of view of the agent. By asking the defendant, it's true that there probably would be some individual calls and we could sit there and say that, too. But in our view, it seems appropriate when we identify the calls if the criteria is going to be the context of the call or the content of the call and that's going to affect the agent's decision to keep listening, then it seems to us that the burden would then be on the government to come forward because they're in the best position to answer that. Not surprisingly, that took most of my time. It is a very important issue. I guess the only other issue in my very few seconds is I did want to briefly address the question of the forfeiture in the context of the Eighth Amendment. This is, as best I can tell, a completely novel issue. Whether or not the general rule of conspiracy that allows for joint and several liability essentially is read into the Eighth Amendment or I can't trump the Eighth Amendment, of course. But it is our view that the Eighth Amendment is not an alternative, as we suggest $15 billion is on a man represented by a court-appointed lawyer and who was just a plaza boss for a little town of 5,000 people. If the principles of conspiracy are enough to bring in sales in which the defendant was not himself involved or time in prison, why is the $15 billion, which is a big number, beyond life? It can't go higher than the years in prison issue. Apart from that, is there any reason to distinguish between the two? I'm sorry. I'm not sure I follow that question. You're asking the court, in effect, to draw a distinction between the use of fine, forfeiture. I'm just wondering what's the principle of distinguishing between those two. This circuit has actually been pretty good about recognizing that for sentencing purposes, merely the fact that a defendant has been found part of a conspiracy doesn't make the defendant liable for everything that the conspiracy occurred. You have the test of reasonably foreseeable. It isn't the case that simply being convicted of a conspiracy, which is the government's charging decision, that's what's driving it. I think we've gone beyond that. Our use of reasonably foreseeable has been with respect to related conduct, which would not be covered by the jury findings for the conviction. That's what, in many cases, goes to determining the length of a prison sentence. You're asking me to distinguish that. I understood the question, Your Honor. You were asking me, why am I drawing a different distinction between sentencing in terms of incarceration versus a forfeiture? What I'm saying is, look, this Court has said simply finding somebody guilty of a very large conspiracy doesn't mean for sentencing purposes, going by the sentencing guidelines, relevant conduct, that's the time in prison, it doesn't mean that the defendant is held responsible for everything the conspiracy did. Because it is a charging decision by the government whether to bring someone into a conspiracy, to charge them with a smaller conspiracy. You have to look at what the evidence shows the defendant actually did. In this case, he was not one of the leaders of the conspiracy. Can I ask you a couple of follow-up questions? How do you draw the line? So, I mean, you've got a big number. Fifteen billion is a big number. I think everybody can stipulate to that. But is your argument that it wasn't, as a matter of fact, in this case, it was not reasonably foreseeable to your client that the conspiracy writ large was bringing in those sorts of sums? Which would operate within the framework of conspiracy law as we know it now because it would apply the test of reasonable foreseeability that you rightly allude to? Or is your point that it's something else? And I'm thinking, suppose you have an example where it's undisputed that everybody in a large conspiracy knew that this was a big deal and we're bringing in all boatloads of proceeds, billions upon billions. So everybody understood that. But there's still some other extant Eighth Amendment principle that kicks in and says, even if you knew, even if it was reasonably foreseeable to you that the conspiracy was bringing in billions upon billions of dollars, you simply can't be imposed, you simply can't be assessed a fine of that degree on a joint and several basis with other people. Yes, that would be my argument. And the reason I go back to that is because defining what the conspiracy is is a function of the charging decision by the government. Yes, but it has to, I mean, if the evidence doesn't support it, then the conspiracy, then a narrower, either no conspiracy or a narrower conspiracy is found. Well, but let's look at the two examples in this case, Hinosa and Manolo, both of whom are clearly participants in the overall conspiracy, and yet both of them were allowed to plead guilty to much more finite conspiracies. That's a separate issue, right? And that's the issue of equality among. Well, certainly that, you know, that certainly is a key to my sentencing argument. But it also, I think, demonstrates what I mean is, look, the amount that they were required to forfeit because their conspiracy was viewed as smaller simply by a decision by the prosecutor how they wanted to bring that means all of a sudden they have less than my client, who you want to say, well, you know, we tagged him as being part of a 25,000-person conspiracy. And so, therefore, he's got to be responsible for every bit of it. So what's the principle then? Because, I mean, you're alluding to something that applies across cases, and you're saying the government has the flexibility to charge a large conspiracy in some cases, a small conspiracy in other cases. But what's the principle then that tells us that under the Eighth Amendment the amount of a forfeiture in any particular case is unconstitutional? Well, obviously it's fact-driven. I think we get that from the Bajekian, if I'm pronouncing that correctly. You know, there's a number of factors as to when you even trigger an Eighth Amendment analysis. But I don't think any of those factors looks to other cases to figure out whether the government charged a large conspiracy or a small conspiracy. Oh, I don't think, no, those didn't. But then, frankly, the forfeiture, nobody that I'm aware of has raised an Eighth Amendment argument saying applying the joint and several liability from conspiracy theory is a violation of an individual's Eighth Amendment right against an excessive fine. So it's a novel issue. The Supreme Court certainly struggled with it. Now, that's a restitution case. I understand that. But they made some references to what was troubling about that, that no opportunity to get contribution. I was going to ask you, though, whether or not any, and I haven't done the research yet, but in the Eighth Amendment context, whether there's that history. In other words, no opportunity in fact or practically to get contribution, even if the fine were otherwise okay, no possibility this defendant could ever pay it, even if he mortgaged everything he had in the world and his grandchildren's future as well. And so beyond your point about equality of defendants, you have this other argument that you put under the third or fourth factor, which is the extent of culpability. Well, I think that's extremely important. I obviously tried to emphasize that in the sentencing portion, but I think it tails over into the forfeiture point. It's just that most of the times when you see these joint and several, the conspiracy is a relatively finite conspiracy. Not everybody knows everybody else about it, but they're taking place at least in one city usually, maybe with a supplier from another city. It's just more finite than charging a 25,000-person conspiracy in an entire country. So your argument is not that joint and several liability for co-conspirators vis-à-vis forfeiture necessarily violates the Eighth Amendment? Correct. I'm not making that blanket assertion. So when you say there's something novel about this case, it's not novel in the sense that applying joint and several liability principles for purposes of a forfeiture award to a conspiracy is not novel. As a basic proposition, you're not making that. So what's novel here is it's a really, really big award. And in our view, then, it's so excessive it implicates the Eighth Amendment. But it's a really, really big conspiracy. It does seem to be a gargantuan award, but it also seems to be a gargantuan conspiracy. So what's novel about the size of the award seems predicated on the novelty of the size of the conspiracy. And unless you have some principle for telling us what in the Eighth Amendment just doesn't allow the forfeiture to grow commensurately with the scope of the conspiracy, I'm not exactly sure what the principle is by which one a court should determine. But I think it has to be kept in the—because I believe the Eighth Amendment is an individual right. And if that's the case, then I think you have to look at the conduct of the defendant. And to hold him accountable for the Zetas, I just think is unfair. And where the lines get drawn, I don't know. You saw how the Supreme Court in Paralline, with all those different decisions, I don't think anybody agrees it would be an easy decision. And if we change places, I'm sure I'd have a hard time articulating something in writing as well. And I don't mean to say this is a simple issue. But it's just, when you have one, okay, we all sort of knew what was going on. I knew he was doing this then and so forth. Versus, yeah, I guess they were doing something in Jalisco. I don't know anything about it. I didn't know anybody there. But yeah, I guess probably something was going on in Jalisco. Something was going on in Oaxaca. But that's what we're sort of talking about. If it was sort of like, hey, look, you were in Miguel Alamein, how much did you know about what was going on there? Because your plaza was part of a larger plaza of Miguel Alamein. That might be a reasonable analysis. But I think it's got to be, I think it has to be viewed at from the point of view and the culpability of the individual. And I think that requires much more specific findings about what was reasonably foreseeable to him. All right. Good morning, Your Honors. May it please the Court. Nina Goodman for the United States. I'd like to begin by addressing the wiretap issues. And I'm obviously happy to answer any questions the Court has. With respect to the minimization, this Court has already stated where the burden lies in the Carter case. And the Court has stated that until the defendant identifies conversations that should not have been intercepted, but which were in fact intercepted, then the issue of minimization is not in play. And defendant's argument is, well, I identified specific calls, and as the Court discussed with him, that were ultimately determined to be non-pertinent and which were also longer than two minutes. And there are two reasons why that doesn't meet the defendant's burden here. The first reason is that what the Court said in Carter is that the defendant has to identify calls that should not have been non-pertinent, but which was not minimized, is not the same thing as a call that should not have been intercepted. And the Supreme Court and this Court have made that clear. But the other problem with the defendant's showing is that he says nothing about the content of the calls. And he had tapes of all these calls. He had lists of the calls with who was involved. He has the content. In the government's discovery to the witness, he was provided with a tape of all the calls that were intercepted from the pertinent target devices, the pertinent cell phones. And so he has access to all of this. Is that just a general practice? Does the government always disclose the contents of calls that were intercepted in connection with the case? I'm not sure, Your Honor. But in this case, that was the government did that as part of its obligation under Rule 16. And so the defendant has to say, I mean, this Court in the Ernest Glover case said what's relevant is the content of the calls. And he hasn't said anything about the content of these calls whatsoever. I mean, if you look at one of the lists, for example, for target device 32, he says, well, there's three calls that were non-pertinent, that were over two minutes. And this, of course, ignores the more than 100 pertinent calls that were intercepted during the time period. But setting that aside, they're all Mr. Canofloros talking to an unidentified person. And so one of the principal purpose of the wiretaps, as stated in the wiretap affidavits, was to identify other members of unknown members of the conspiracy, of this vast conspiracy, and to figure out the command structure of the conspiracy. And so as the district court found, in addition to finding that he hadn't met his burden, there are all kinds of factors about this conspiracy that make it clear why the government would continue to listen to non-pertinent calls, and particularly those involving unidentified persons. I mean, and everything has already been stated here. The vast scope of the conspiracy, the use of code words, the ambiguous language, the ever-changing task of characters. Could failure to minimize ever be shown in a conspiracy case like this? Well, Your Honor, it could be shown if the defendant said, oh, but look, there's a pattern of calls with my girlfriend, and the government didn't bother to minimize those. But there has to be something. Girlfriends have been known to participate in conspiracies. Right, and so as a practical matter, this is the height of a case. If there's ever a case where you're saying the government has the greatest latitude to continue to listen to calls that might have ultimately been determined to be non-pertinent, I would suggest that this is that case. So this case is argued as if there is a geographically large area being covered, and the government has an interest in illegal activity occurring in this large area that is affecting the United States. The government has free reign. I mean, there's so many times I see that in the brief. And so we wrote an opinion that says this is a unique gulf cartel case, and it only applies here. I mean, we're just trying to come up with some standards, or as Judge Srinivasan said, principles to apply here. And largeness can't be the answer to everything. No, Your Honor, that's correct. But we don't think the court needs to break any new ground to say that the minimization was appropriate here. No, but what I'm getting at is Judge Williams' question about is it impossible for a defendant, given the purpose of the wiretap. Once the judge authorizes a wiretap to determine who's involved in the conspiracy and what the command structure is, what protection is there, if any, left for a defendant to seek to enforce? Well, but the defendant could, for example, as in some cases, say, but the wiretap continued, and it became clear that I spoke to certain people. There were patterns of conversations that were not pertinent, that should have been minimized. An example, if the court wants an example, you can look at the recent case from the Fifth Circuit, the North case, where the defendant identified a conversation that was with a girlfriend, where it continued for an hour just talking about non-pertinent things, and then it got to the some criminal matter. And the court in the Fifth Circuit held, well, that should have been minimized. What's the remedy for if you have a case like that, and there is a failure of minimization? The remedy is suppression of that particular call. So we're talking about non-pertinent calls. Well, that's an example of a case where the call should have been minimized. Ultimately, the court found, the Fifth Circuit found the call should have been minimized, but ultimately information came out at the end of the call that actually was useful. But what the court said was, given that it was a non-criminal discussion for an hour with a girlfriend, the government should have minimized before that. But the point is, well, there are two points. One is that the defendant there identified a call and said, look, here's this call, it should have been minimized. At that point, under this court's law, that would give the government an obligation to, at least it would put the minimization issue in play. So the Fifth Circuit was focusing on the hour. The Fifth Circuit was focusing on the hour, but what it was focusing on more, Your Honor, was the content of the discussion. And what this court said in the Ernest case was that the content of the discussion was important, so that reasonableness of minimization turns on the content. And if I could just return, and here there's nothing identified about the content, but if I could just return to Judge Srinivasan's question, it's clear when the statute provides for, that the defendant can move for exclusion of any communication that's intercepted in violation of the order, the order requires minimization, that's referring communication by communication. Your Honors, I'd like to, if I could, address the jurisdiction. Have we held that, just so I'm clear? This court has not held that. The court has said it and noted it in dicta in the Scott case. Your Honors, I'd like, if I could, to just briefly address the jurisdictional issue on the wiretap. The government's argument there is that under the plain language of Title III, which authorizes a court to approve the interception of communications within its own jurisdictional bailiwick. And then the statute then goes on to define interception as oral, A-U-R-A-L, acquisition of communications, contents of communications, that that authorized the district court in this case, the courts in the Southern District of Texas, where the investigation took place, where the crime took place, at least within the United States, and where the government first orally acquired, that is, heard the contents of the calls, that that authorized the district judges in Texas, then had jurisdiction to authorize that interception. That's what every five of the courts of appeals, every court of appeals that has considered this issue, has ruled. And we believe that that's what this court should hold here. The defendant says, well, but the calls themselves took place in Mexico. And that's correct. But the statute makes clear that, and the district court found that it's not the location of the calls. It's where the calls are intercepted. And here that was in the Southern District of Texas, which is exactly the jurisdiction that authorized the wiretap. And when you say where it was intercepted, this is the listening post rationale. And is a listening post, just as a matter of technology, is a listening post a contemporaneous listening? Is that typically what happens? There's a conversation going on and there's a technology set up to enable. So you can't, in other words, couldn't have a situation in which the government takes a call and then sends the cassette tape over to, before ever listening to it, sends the tape over somewhere to some other district, and then plays it for the first time in that other district and says, oh, that's the first time anybody ever listened to it. Well, I've never heard of that happening. That's certainly not what happened here, Your Honor. I mean, there was a provision consistent with the statute that if no Spanish-speaking DEA contractor was available, that they could record the call, then whether it was contemporaneous, that as a call came in, the monitors would listen to the call at that time. That was the first time. And then can I just get your understanding? So we have this case, Glover, that deals with the mobile intercept device. And can I just get your understanding of the rest of the dealing with mobile intercept device that was at issue in Glover? And the particular question is, why does that parenthetical refer to interceptions outside the jurisdiction, but within the United States, if it's the case that the listening post is good enough already? Because if the listening post is good enough already, the fact that the mobile intercept device goes somewhere else, at least in today's technology, wouldn't seem to matter because you'd always be able to listen to the listening post, no matter how far and wide the mobile intercept is. Does it have to do with the change of technology over time? Well, Your Honor, the government obviously very respectfully disagrees with the court's analysis in the Lonell Glover case. And so the government in that case did rely on the listening post. But what this court said is that, no, this is different because here you have a mobile interception device, something that is installed, physically installed on private property. And obviously nothing of the kind occurred in this case. There was no physical installation of any kind. But the other thing the court, and the court's ultimate holding in the Lonell Glover case, was that the particular order in that case was invalid on its face. Because it said, you, I'm a court in the District of Columbia, you may go and install something that it shows here is on a vehicle that it shows here is in Maryland. And so with the mobile interception device, as the court interpreted it, it was that physical installation where the problem arose. That's not present here. What I don't understand is, even if the physical installation occurs somewhere else, if the listening post rationale, that should be enough. That was the government's argument. Right. And that argument didn't succeed. That argument didn't succeed. In the face of that non-success, I guess what I'm asking is, then how did we go forward in this case? Because that case had a listening post argument advanced by the government that this court did not accept. That case, the court made clear in Glover, and it specifically distinguished the cases the government is relying on here. And the reason it distinguished them, it said those addressed an issue that is not presented here, the issue of a telephone wiretap. And what the court focused on in Glover was the physical installation of the mobile interception device. That's what it found was the violation that made the order in that case invalid on its face. Here there's nothing of that kind. And as you say, the court was focusing on the meaning, the specific meaning of the mobile interception device clause that also isn't presented here. But it's important to realize that, yes, the government relied on the listening post theory in Glover, and the court did not accept or reject it. But it found that the thing about Glover was you had to go an additional step. You had to say, based on the Supreme Court's decision in the Dahlia case, that somehow this mobile, this physical interception in another district was therefore authorized, because everything was fine with the interception. And that's where the court seems to have rejected the government's argument. And the court did that by looking both at the statute and at the federal rule, federal rule 41, and saying, well, but that physical trespass on, sorry, physical trespass on private property is not a violation. That physical trespass on private property in another district, that's what made this order invalid on its face. And so our position with respect to Glover is that it simply, as the court said, does not address the issue presented here, where you have no physical intrusion, no trespass of any kind. You just have the interception at the listening post, which every other circuit has said is a violation. It's a valid reading of the statute. It's consistent with the plain language, and we think this court should adopt it. I'd like to turn, if the court, very briefly to the forfeiture issue. And I think the forfeiture was large, and if you're looking at the factors, they really, in this case, do weigh very heavily against the finding that the forfeiture was grossly disproportionate. Has it ever been a bigger one? Not that I'm aware of. This may be the biggest forfeiture award ever. It may be. I have not researched it to see, but this seems like the largest I'm aware of. But at the same time, the extraordinary nature of this case is what means that the forfeiture is not itself grossly disproportionate. And first of all, it's important to note that the district court found that this amount, the $15 billion, which was a very conservative estimate of the proceeds of this 10-year cartel activity, this 10-year conspiracy, was all reasonably foreseeable to Mr. Canoflores. Can I ask you a question before we get to that, which is, under the statute, 853A is the forfeiture provision, and it authorizes forfeiture or mandates forfeiture of any property constituting or derived from any proceeds that the person obtained directly or indirectly. And how do you get from a statute that refers to what the person obtained to assigning to the person $15 billion based on what the entire cartel obtained? Well, courts have held, and as the defendant concedes here, that a defendant is jointly and severally liable, in a drug conspiracy case specifically, a defendant is jointly and severally liable for the reasonably foreseeable proceeds of the conspiracy. And that's consistent with general conspiracy law, subject, of course, to an Eighth Amendment constraint. I mean, that's the statutory provision, but the Eighth Amendment issue is separate and is a separate constraint for an award that would be found under the relevant factors. Right, so I'm just asking under the statute itself, before we just go to the Eighth Amendment, and I know you want to get to the Eighth Amendment when we want to hear you, but under the statute itself, does conspiracy law kick in and tell us that when the statute refers to the person, it's really talking about what the entire conspiracy obtained? Or how does conspiracy law intersect with the text of this provision in a way that allows us to say that one person, although they didn't receive, either indirectly or directly, $15 billion, that degree of forfeiture can still be imposed against them? It kicks in in this way, Your Honor. In general, under conspiracy law, a defendant is responsible for what's reasonably foreseeable to him in terms of punishment. And so if there were aspects of the conspiracy that were not, for example, if someone was a very small courier, that might not apply. But for the joint and several liability, applies based on the reasonable foreseeability to that person. Because if you join a conspiracy, that's what you're responsible for. I'm not understanding why the courier wouldn't fall within the fold of your argument. If the courier knows that the courier is becoming part of a vast conspiracy that's taking in billions and billions of dollars, wouldn't the courier fall within the statute, too? Well, it would depend on the facts, Your Honor. It would depend on what the court found was reasonably foreseeable to that particular person. And here, the district judge did find that this was reasonably foreseeable to Mr. Cannaflores. And the this that has to be reasonably foreseeable is what? The amount that the conspiracy takes in over the duration of the charged conspiracy? Whatever part of the amount. To say this was based on the evidence at trial and the testimony at the sentencing hearing, the proceeds of the entire cartel over 11 years was vastly more. It was only $3 billion more, according to your conservative estimate. But that was based on the, not to get too much in the weeds, that was based on what the Zeta, Mr. Mamito, who worked closely, by the way, with Mr. Cannaflores, that was based on what he had personal knowledge of. I know, but that's the only evidence that's before the district court. Right, that's right, Your Honor. The government has no hope of getting another $15 billion or even a modest fraction of $15 billion from the defendant here. Is the government asking for $15 billion just to establish the principle? Establish the principle in the face of extraordinary numbers so that there might someday come defendants who might have $15 billion on hand to be collected by the government? Well, Your Honor, I think that all I can say, based on the record, is that the government was applying the law here and asking the district court to apply the law. And in general, forfeiture, I mean, forfeiture is mandatory, and it doesn't depend on whether the defendant ultimately might have the ability to pay. If the court has no further questions... How about the Eighth Amendment? The Eighth Amendment issue here, when you look at the factors, I think it's, as Judge Srinivasan might have remarked earlier, it's an extraordinary amount, but it's not grossly disproportionate, given the extraordinary nature of the crime. Not grossly disproportionate to this man's conduct? Well, Your Honor, if you look at the factors, one of them is... I think it takes into consideration the test that has been stated by this court and others. It takes into consideration both the crime that he joined and the harms resulting from the defendant's conduct. And in this case, Mr. Pena-Flores seeks to minimize what his conduct was, but the record in the district court shows that he participated in exactly, centrally, what was causing the harm, wreaking what the district court saw as the tragedy of the corruption, the corruption of the police, the corruption of the justice system, and obviously, the extremely large amounts of drugs and the violence. I mean, to say, oh, well, he wasn't a Zeta, that's just wrong. The Zetas and the Gulf Cartel were the same organization until 2010. But he wasn't shown to have killed anybody? He didn't directly kill anyone, or he wasn't proved to have. He certainly supervised the cold room where people were kept while they decided whether to kill them. He certainly, on wiretap conversations, urged and agreed to the killing of someone who he thought might have been snitching on him. And there was testimony of the trial that every member of the cartel benefited personally from the activity of the enforcers from the Zetas. So do you know, historically speaking, of the Eighth Amendment, whether the fine was viewed as a personal fine in terms of something the defendant could pay? And if it's grossly excessive, it's clear the defendant could not pay it? I think the proportionality. I have to say, first of all, no, Your Honor, I'm not familiar with that history. But to the extent that I know, I think the proportionality is between the fine and the crime, and that the defendant's ability to pay. I mean, these factors all look to the factors that the court has applied. They all look to what was the crime and what was the defendant's responsibility, but not really the ability to pay. So here Congress set a fine? That's right. So this is how many thousands? Many thousands, that's correct. That's the factor the defendant has identified that weighs in his favor. And you don't take an issue with the relevance of that factor? No, we don't. Our argument is that in terms of looking at whether this is grossly disproportionate, this is a particularly extraordinary case. And the extraordinary nature of the facts and of the defendant's conduct and of what the harm is, what makes this larger than the maximum fine by many times, but yet still not grossly disproportionate. And where does the defendant's conduct fit into this? So under the principles that you outline, a person who had a much lesser role in the conspiracy could still have joint and several liability for all the proceeds taken in by the conspiracy over the period of the charged conspiracy? That's correct. And then I think the test seems to focus not only on the crime itself, but also on the harm caused by the defendant's conduct. And on the defendant, was the defendant the type of person at whom this kind of criminal prohibition was aimed? And that's focusing on the defendant himself, but here that factor weighs very heavily in favor of holding the defendant responsible. But the criminal prohibition being the underlying substance of offense? Correct. Yes. Which is a drug conspiracy. Correct. And so you look at what the defendant did, and he was an extremely central player in vast drug transactions that continued for a decade. And he was a leader in the conspiracy. He supervised, he managed, he took advantage of the violence. Before that, he was a corrupt police officer who dealt in drugs and protected drug traffickers to benefit himself. And so that seems very central to what both the nature of this crime and to what the law is intended to prohibit. I'm not following what distinguishes him vis-a-vis conspiracy law from a courier. What distinguishes him from a courier is that his role, the harm that he caused, is very central. It's crucial. It's extremely, it expands over, his conduct expanded over a vast part of this conspiracy. It wasn't a tiny part of it. He was both a corrupt police officer who was involved in the conspiracy from 2001 and then joined the cartel itself, was a member of the cartel, was in charge of providing the cartel with all sorts of... The principle you're advocating would encompass the courier, at least to the extent that the total take of the conspiracy was reasonably foreseeable to him. That would be true for the determination of the amount of forfeiture, but the Eighth Amendment issue is a separate issue, and there you might consider how the defendant fits. I don't mean to belabor this point, but what I'm not following is when you say to consider how the defendant fits, I get that in some gestalt sense, a courier seems less significant than other people might see in a drug conspiracy, but the law, it seems like the inquiry that's called for by Bochkajian and that you sign on to in your brief looks at the focus of the law that's proved to have been violated. The law is drug conspiracy. With drug conspiracy, a courier is right in the heartland, I think. Well, you're right, Your Honor, but it also looks to the nature of the harm caused by the defendant's conduct, and there you'd probably look and say, well, he... So that's extra statutory, that's just a constitutional overlay that kicks in? That's one of the factors that the court has stated, and so that seems like that might encompass, and it's a very fact-based inquiry, and it's very broad. I know, but we're trying to understand what the purpose is, all right? Because, you know, we see tons of cases where the district courts bemoan the cancer on the District of Columbia as a result of the illegal drug trade, and these conspiracies, and these gangs, all that. And as I say, you know, if this case becomes the big, unique case, we all know that the principles stated are going to be argued in, quote, smaller cases. And just trying to understand, what is the individual right that the Eighth Amendment protects against excessive fines? Well, it protects against a fine that is grossly disproportionate to the crime, as viewed under the factors that the Supreme Court has identified. So the conduct that you suggest is that of a corrupt police officer, as opposed to a leader, a manager, etc. I mean, he was guarding the drugs, he was helping transport the drugs, he was guarding the safe room. I'm not trying to excuse, I'm just trying to understand the nature of his conduct, as opposed to these other people who, because they were the big guys, had some information the government wanted, and so the government allowed them to plead to a smaller conspiracy, and therefore, you know, the forfeiture, the fines are way smaller, and they could pay them. Now you're talking about, and that's the point I thought of, maybe what my colleague is getting at, you'd be making the same arguments with a courier. Well, Your Honor, if I could just clarify on the facts of this case, Mr. Canofloros was not a small player. I mean, the District Court found he was a manager or supervisor. He was both a corrupt police officer. He was managing one of the most important, an extremely, what every witness testified, was an extremely important importation route at this, yes, isolated place immediately on the Rio Grande, directly across from... I'm not even saying he was a guard. A corrupt police officer, allowing things to go through. I'm just saying he wasn't the man, as your own brief acknowledges, he was not the leader, he was not calling the shots. He was calling the shots, Your Honor. He managed a large group of people. Just to be clear... They said, I mean, he had people who transported, he had people who stored, he had people who brought the drugs in. So he wasn't just one of the people. He was actually a manager? He was a plaza boss, as they called it. I know, but he was a plaza boss in a town of 5,000, right? The importance of the town was not in how many people lived there. The importance of the town, as every witness testified, was that it was a very important... It was a gateway. It was a gateway right on the Rio Grande in a place where they could cross the drugs over and large, large quantities of drugs went through there. And so he was in charge of all security? He was in charge of the security there. He was in charge of the site where they kept the people who had been kidnapped before they decided... And people were reporting to him? Yes, people were reporting to him. On the phone call, people called in and reported to him and said, this is what's going on. They got our drugs. The delivery in May 2007 of $2 million worth of marijuana that was seized. People immediately called and reported to him because he was in charge of it and he benefited directly from it. And so it's important... I don't... I mean, if there's a drug conspiracy in the District of Columbia that takes in $15 billion over a 10-year period and involves this kind of conduct, then maybe that $15 billion forfeiture would be proportionate there. But this is, we believe, a unique case. Can I just follow up on one final point along the same lines, which is that the four-factor test that you sign on to in your brief, that's a distillation of the considerations that the Court alluded to on budget occasion. The fourth factor, as you've mentioned a few times, is the nature of the harm caused by the defendant's conduct. And that's different from whether the defendant fit into the class of persons for whom the statute was principally designed, because that could encompass anybody in the drug conspiracy at least. So the fourth factor at least has the potential of drawing a distinction based on the particular type of conduct in which the individual engages. But then when you say, when you apply that factor, as I read your brief, and on page 62, it says that the one sentence that refers to that fourth factor is the harm caused by the offense was, as the District Court found, tragic. So when you say the offense, if that's just referring to the harm caused by the conspiracy, well, then there's still no basis for drawing a distinction based on degree of conduct. I take it what you're telling us now is, no, you look at the particular conduct engaged by the individual. I think courts have looked at all the facts, all the relevant facts. And in this case, I think if I could slightly amend that sentence in my brief, I would add that, and we know that the defendant's conduct, he was important, he was critical, he played a major role, he was involved in all these aspects, other than physically murdering someone himself, as his friend Metro Trace assured him, you will not get your hands dirty. But he was very, very dirty. And that was a factor the District Court could take into consideration. And we'd ask that the judgment be affirmed. Thank you. All right, Counsel for Appellant. Would you like a couple of minutes? Thank you. I appreciate that. Let me just say, with respect to the question about the nature of remedy, the government has made a statutory argument about what the remedy is, and I respectfully suggest the government has that wrong, and I think I tried to deal with that directly at page 8 and 9 of our reply brief, so I won't repeat those arguments. The Supreme Court counsel said that you had a complex of calls. Is that correct? Yes. Let me just say, I'm not trying to, on the one hand, I'm not trying to minimize Mr. Connell Flores' role. I mean, he was clearly involved in drug trafficking and of large quantities of drugs. But what we are talking about is, the government says Las Guerra was the place, apparently, but there was no evidence of that. They had never introduced any evidence of how much drugs passed through that place. But the fact of the matter is, that was a small town, with a couple of little villages attached, that was part of a much larger city of Miguel Alamein that had other little towns part of that larger plaza, and that was part of the state of Tamaulipas. And then there's other places in Mexico as well that my client never set foot. But I'm just suggesting that... How is that relevant if the place where he was in charge was a very important transmission spot? There was no evidence of that. I mean, the witness is always important, but what does that mean? The border for Texas and Mexico, just Texas, is 1,200 miles long. And drugs were going through all of these plazas. They weren't all funneling into Las Guerra. They were crossing everywhere they could. The marijuana, they say, is attributed to him. That was found in a completely different location. I just think it's important to understand that I recognize that his conduct, in terms of his sentencing and in terms of the forfeiture, would be serious. I'm just suggesting that in relation to people who really did run 20,000 people, who really did kill and torture dozens, that's what I'm trying to compare it to, Judge. And that's why I will rest on my sentencing and my forfeiture. Thank you. We'll take the case under advisement. Case number 13-5153. Oh, excuse me. Mr. Gilmer? Yes, Your Honor. I gather you were appointed by the court. Yes, Your Honor. And the court wishes to express its appreciation to you for your always fine work. Thank you. It's been a challenging case. Yes.
judges: Rogers, Srinivasan, Williams